## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYNDA RITZ, individually and on behalf of all others similarly situated, and derivatively on behalf of Nominal Defendant ERIE INSURANCE EXCHANGE, | ) ) ) ) | Case No.   1:17-cv-340 |
| | ) | |
| Plaintiff, | ) ) | |
| | ) | **VERIFIED CLASS ACTION AND** |
| v. | ) | **DERIVATIVE COMPLAINT** |
| | ) | |
| ERIE INDEMNITY COMPANY,  J. RALPH BORNEMAN, JR., TERRENCE W. CAVANAUGH, EUGENE C. CONNELL, LUANN DATESH, JONATHAN HIRT HAGEN, THOMAS B. HAGEN,  C. SCOTT HARTZ, BRIAN A. HUDSON, SR., CLAUDE C. LILLY, III, GEORGE R. LUCORE, THOMAS W. PALMER, MARTIN P. SHEFFIELD, RICHARD L. STOVER, ELIZABETH A. HIRT VORSHECK, and ROBERT C. WILBURN, | ) ) ) ) ) ) ) ) ) ) ) | Jury Trial Demanded |
| Defendants, | ) ) ) | |
| and | ) ) | |
| ERIE INSURANCE EXCHANGE, | ) ) | |
| Nominal Defendant. | ) ) ) | |

Plaintiff Lynda Ritz ("Plaintiff"), by and through her attorneys, on behalf of herself and all others similarly situated and derivatively on behalf of Erie Insurance Exchange ("Exchange" or the "Exchange"), based upon personal knowledge with respect to her own circumstances and based upon information and belief or the investigation of her counsel as to all other allegations, alleges the following:

### <u>INTRODUCTION</u>

1.      As set forth herein, Plaintiff seeks to recover for herself and the Class for harm suffered as a result of the Defendants' utter disregard of their fiduciary duties while serving as

the attorney-in-fact for the Class as well as for breaching the Subscriber's Agreement by charging unwarranted and excessive Management Fees in violation of the implied covenant of good faith and fair dealing.   Plaintiff also brings derivative claims on behalf of nominal defendant Exchange to remedy Defendants' breaches of fiduciary duties and to recover the losses that Exchange has suffered as a result of Defendants' self-interested misconduct.

2.     In 1925, H.O. Hirt founded Exchange and Erie Indemnity Company ("Indemnity") with the express intent that the Exchange is "organized and exists primarily *for the benefit of its subscribers* or policyholders and that therefore the interests of the people who put their trust in the Exchange for the protection of their personal business affairs must come first."[1] Unfortunately, over time, the interests of the subscribers of Exchange have become subservient to those of a conflicted and self-interested board of directors of Indemnity (the "Board") and its controlling stockholders.

3.     The Exchange is not structured as a traditional insurance company.   Instead, Exchange is a subscriber-owned reciprocal insurer wherein every policyholder (each, a "Subscriber" and, together, "Subscribers") agrees to pool risk by acknowledging a reciprocal agreement of indemnity.   This type of organizational structure is "of interest to individuals wanting to participate in a not-for-profit insurance environment focused on the policyholder."[2] As a reciprocal insurer, the Exchange is an unincorporated association with no board of directors or employees of its own.   Accordingly, every Subscriber executes a "Subscriber's Agreement" appointing Indemnity as their attorney-in-fact to manage and conduct the business and affairs of

---

[1]  *See In re Trust of Hirt*, 832 A.2d 438, 441 (Pa. Super. 2003) (citing to Subparagraph 4.03(B) of the Hirt Trust Agreement, discussed *infra*.) (emphasis added).

[2]     *See* Alex Burke, *What Is a Reciprocal Insurance Company?*, ZACKS, http://finance.zacks.com/reciprocal-insurance-company-7135.html (last visited Dec. 26, 2017).

the Exchange.  *See* a true and correct copy of the Subscriber's Agreement, attached hereto as Exhibit A.

4.      The Subscriber's Agreement provides that Indemnity may retain up to 25% of all premiums written or assumed by Exchange as compensation for serving as attorney-in-fact and managing and conducting the business and affairs of Exchange, including the payment of general administrative expenses (the "Management Fee").  *See* Exhibit A.

5.      As the attorney-in-fact, Indemnity, through the Board, serves as a fiduciary to Exchange and the Subscribers and is obligated to act with the utmost loyalty, honesty and integrity and at all times in the best interests of Exchange and the Subscribers.

6.      Instead of acting with undivided loyalty and integrity, the Defendants—both Indemnity and the Board—have operated with hopelessly conflicted interests and abused their position of absolute power so as to benefit themselves at the expense of Exchange and the Subscribers.

7.      In particular, subsequent to Indemnity becoming a publicly traded company on NASDAQ in or around 1995, the interests of the stockholders of Indemnity, and specifically the majority stockholders who dominate the Board, have taken priority over the interests of the Exchange and the Subscribers.  Since that time, Indemnity's controlling stockholders, who are among the Defendants, have reaped *hundreds of millions of dollars* in dividends from Indemnity stock, based in large part on grossly excessive Management Fees wrongfully taken from Plaintiff, Exchange and all similarly situated Subscribers who are members of the proposed class defined below (the "Class") which amounts were then used to pay enormous dividends to the members of the Hirt family who control Indemnity.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to the

Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because one or more members of the

Class are citizens of states different from the states of which some Defendants are citizens, there

are well in excess of one hundred (100) Class members and the aggregate amount in controversy

exceeds $5,000,000, exclusive of interest and costs.  This Court also has supplemental subject

matter jurisdiction over the claims of Plaintiff and the proposed Class pursuant to 28 U.S.C. §

1367(a).

9.      Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part

of the events or omissions giving rise to the claims alleged herein occurred in this district, and

Plaintiff resides within this district.

## PARTIES

10.     Plaintiff Lynda Ritz has been a Subscriber of Exchange since 2000 and is a citizen

of Pennsylvania.

11.     The nominal defendant Exchange is a reciprocal insurance exchange—an

unincorporated association through which individuals, or "Subscribers," may exchange contracts

to indemnify each other for losses—organized under the laws of the Commonwealth of

Pennsylvania.[3]  Exchange functions as a type of insurance company and, in that capacity, issues

policies of insurance to Subscribers located in Pennsylvania and at least eleven (11) other states,

as well as the District of Columbia.  Because Exchange is a reciprocal insurance exchange with

no employees, officers, board of directors, bylaws or organizing documents, the Exchange is

operated and managed by Indemnity, Exchange's attorney-in-fact.

---

[3] *See* 40 Pa. Stat. § 961 (authorizing the exchange of reciprocal or inter-insurance contracts amongst individuals, partnerships, and corporations of the Commonwealth of Pennsylvania).

12.     Defendant Indemnity is a publicly traded corporation organized under the laws of the Commonwealth of Pennsylvania and doing business throughout the United States.  Both Exchange and Indemnity and their subsidiaries and affiliates operate, collectively, under the name "Erie Insurance Group."

13.     Defendant J. Ralph Borneman, Jr. ("Borneman") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 1992.  He has served on several of Indemnity's committees, including the Executive Compensation Committee from 1997 through 2001, the Executive Compensation and Development Committee from 2002 to 2003, the Nominating Committee from 1997 through 2004, the Charitable Giving Committee from 2005 through 2017, the Technology Committee from 2005 through 2008 and again from 2010 through 2017, the Strategy Committee from 2005 through 2008, the Strategy and Technology Committee in 2009, the Executive Committee in 2009 and 2015, and the Exchange Relationship Committee from 2009 through 2017.  According to Indemnity's Proxy Statement, filed with the Securities and Exchange Commission ("SEC") on March 24, 2017, Borneman owns 50,000 shares of Class A common stock and another 13,862 vested Class A share credits under the Deferred Stock Plan for Outside Directors.  Borneman is a citizen of Florida.

14.     Defendant Terrence W. Cavanaugh ("Cavanaugh") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 2008 through July 31, 2016.  He has served on the Charitable Giving Committee and the Investment Committee from 2009 through 2016, the Strategy and Technology Committee in 2009, and the Strategy Committee from 2010 through 2016.  Cavanaugh served as the President of Indemnity from July 2008 through December 31, 2016 and the Chief Executive Officer from July 2008 until July 31, 2016.

According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Cavanaugh owns 59,439 shares of Class A common stock. Cavanaugh is a citizen of Pennsylvania.

15.    Defendant Eugene C. Connell ("Connell") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2017. According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Connell owns 17,002 shares of Class A common stock. Connell is a citizen of Pennsylvania.

16.    Defendant LuAnn Datesh ("Datesh") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2016. According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Datesh owns 495 vested Class A share credits under the Deferred Stock Plan for Outside Directors. She serves on the Audit Committee. Datesh is a citizen of Pennsylvania.

17.    Defendant Jonathan Hirt Hagen ("J. Hagen") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2005 and as Vice-Chair of the Board since 2013. During such time, he served on several of Indemnity's committees, including the Strategy Committee from 2006 through 2008 and again from 2010 through 2017, the Audit Committee from 2010 through 2016, the Executive Compensation and Development Committee from 2007 through 2009, the Compensation Committee from 2010 through 2017, the Nominating Committee from 2007 through 2017, the Strategy and Technology Committee in 2009, the Exchange Relationship Committee from 2009 through 2017 and the Executive Committee in 2010, 2016 and 2017. In addition to the foregoing, J. Hagen has served as one of the three trustees for the three H.O. Hirt Trusts (the "H.O. Trusts") since 2015. J. Hagen is also a beneficiary of the H.O. Trusts which control a majority of the voting stock of Indemnity. According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, J. Hagen

owns 223,130 shares of Class A common stock and another 11,045 vested Class A share credits under the Deferred Stock Plan for Outside Directors. J. Hagen is the grandson of H.O. Hirt, the late co-founder of Indemnity, and son of the late Susan Hirt Hagen, a former director of Indemnity, and defendant Thomas B. Hagen, the Chairman of the Board.  J. Hagen is a citizen of Pennsylvania.

18.     Defendant Thomas B. Hagen ("T. Hagen") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1979 until 1998 and since 2007.  He has served as the Chairman of the Board of Indemnity since 2007.  T. Hagen has served on several of Indemnity's committees, including the Charitable Giving Committee in 1997 and the Executive Committee from 2008 through 2017.  Since 2008, T. Hagen has served as an *ex-officio* member of all of the committees of Indemnity.  He served as an employee of Indemnity from 1953 to 1995, and during such time, he served as President of Indemnity from 1982 to 1990 and as the Chairman and Chief Executive Officer of Indemnity from 1990 to 1993.  T. Hagen is a beneficiary of the H.O. Trusts.  He served as the general partner of the Hagen Family Limited Partnership since 1989.  As general partner, T. Hagen has sole voting power and investment power over the shares of Class B common stock held by the Hagen Family Limited Partnership. According to Indemnity's Proxy Statement, filed with the SEC on March 24, 2017, T. Hagen also owns 5,100 shares of Class A common stock directly, 16,762,189 shares of Class A common stock indirectly and another 8,963 vested Class A share credits under the Deferred Stock Plan for Outside Directors which amounts to approximately 36.31% of the outstanding Class A shares. T. Hagen is the father of defendant J. Hagen.  According to Indemnity's public filings, T.  Hagen is the son-in-law and close associate of the late founder and longtime leader of Indemnity H.O. Hirt.  T. Hagen is a citizen of New York.

19.     Defendant C. Scott Hartz ("Hartz") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2003.  Hartz has served on several of Indemnity's committees, including the Audit Committee from 2004 through 2009, the Investment Committee from 2004 through 2017, the Technology Committee from 2005 through 2008, the Executive Committee from 2005 through 2008 and in 2010 and the Strategy and Technology Committee in 2009, and the Strategy Committee from 2010 through 2017.  According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Hartz owns 2,097 shares of Class A common stock and another 12,949 vested Class A share credits under the Deferred Stock Plan for Outside Directors.  Hartz is a citizen of Pennsylvania.

20.     Defendant Brian A. Hudson, Sr. ("Hudson") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2017.  Hudson is a citizen of Pennsylvania.

21.     Defendant Claude C. Lilly, III ("Lilly") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2000.  Lilly has served on several of Indemnity's committees, including the Audit Committee from 2001 through 2017, the Investment Committee from 2004 through 2017, the Strategy Committee from 2005 through 2008 and again from 2010 through 2017, the Executive Committee in 2008 and 2011, the Strategy and Technology Committee in 2009 and the Exchange Relationship Committee from 2009 through 2017.  According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Lilly owns 678 shares of Class A common stock and another 13,862 vested Class A share credits under the Deferred Stock Plan for Outside Directors.  Lilly is a citizen of South Carolina.

22.     Defendant George R. Lucore ("Lucore") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2016.  He serves on the Charitable Giving

Committee and the Strategy Committee.  According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Lucore owns 1,725 shares of Class A common stock and another 495 vested Class A share credits under the Deferred Stock Plan for Outside Directors.  Lucore is a citizen of Florida.

23.     Defendant Thomas W. Palmer ("Palmer") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2006.  Palmer has served on several of Indemnity's committees, including the Audit Committee from 2009 through 2015, the Nominating Committee from 2007 through 2017, the Strategy Committee in 2007 and 2008 and again from 2010 through 2017, the Executive Compensation and Development Committee in 2009, the Compensation Committee from 2010 through 2017, and the Strategy and Technology Committee in 2009.  According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Palmer owns 770 shares of Class A common stock and another 9,995 vested Class A share credits under the Deferred Stock Plan for Outside Directors.  Palmer is a citizen of Ohio.

24.     Defendant Martin P. Sheffield ("Sheffield") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2010.  During such time, he has served on several of Indemnity's committees, including the Audit Committee from 2011 through 2017, the Strategy and Technology Committee from 2011 through 2017, the Exchange Relationship Committee from 2012 through 2017 and the Executive Committee from 2013 through 2017.  According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Sheffield owns 800 shares of Class A common stock and another 5,271 vested Class A share credits under the Deferred Stock Plan for Outside Directors.  Sheffield is a citizen of Pennsylvania.

25.     Defendant Richard L. Stover ("Stover") has served as a director of Indemnity, and as fiduciary for the Class and Exchange, since 2010.  He has served on several of Indemnity's

committees, including the Audit Committee from 2011 through 2017, the Investment Committee from 2011 through 2017 and the Executive Committee from 2012 through 2013.  According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Stover owns 1,072 shares of Class A common stock and another 5,271 vested Class A share credits under the Deferred Stock Plan for Outside Directors.  Stover is a citizen of Florida.

26.     Defendant Elizabeth A. Hirt Vorsheck ("Vorsheck") has served as a director of Indemnity, and as a fiduciary for the Class and Exchange, since 2007.  She has served on several of Indemnity's committees, including the Executive Committee from 2008 through 2017, the Charitable Giving Committee from 2008 through 2017, the Strategy Committee in 2008 and again from 2010 through 2017, the Strategy and Technology Committee in 2009, the Exchange Relationship Committee from 2009 through 2017 and the Nominating Committee from 2010 through 2017.  Vorsheck has served as one of the three trustees of the H.O. Trusts since 2007.  She also is a beneficiary of the H.O. Trusts which control a majority of the voting stock of Indemnity.  According to Indemnity's Proxy Statement, filed with the SEC on March 24, 2017, Vorsheck owns 69,516 shares of Class A common stock directly and 4,428,914 shares of Class A common stock indirectly through several trusts which amounts to approximately 9.61% of the outstanding Class A shares.  Vorsheck is the first cousin of J. Hagen.  Vorsheck is a citizen of Pennsylvania.

27.     Defendant Robert C. Wilburn ("Wilburn") served as a director of Indemnity, and as a fiduciary for the Class and Exchange, from 1999 until April 25, 2017.  He served on several of Indemnity's committees, including the Audit Committee from 2001 through 2010, the Executive Compensation Committee from 2000 to 2001, the Executive Compensation and Development Committee from 2002 through 2009, the Compensation Committee from 2010

through 2017, the Nominating Committee from 2001 through 2003, the Investment Committee in 2003 and from 2009 through 2017, the Executive Committee from 2004 through 2008 and in 2014, and the Charitable Giving Committee from 2011 through 2017.  According to Indemnity's Proxy Statement filed with the SEC on March 24, 2017, Wilburn owns 2,700 shares of Class A common stock and another 13,862 vested Class A share credits under the Deferred Stock Plan for Outside Directors.  Wilburn is a citizen of Virginia.

28.    The individual defendants are collectively hereinafter referred to as the "Directors" and with Indemnity are collectively referred to as "Defendants."

## FACTUAL ALLEGATIONS

### History of Exchange

29.    When founding the Exchange in 1925, H.O. Hirt did not structure it as a traditional stock insurance company.  He wanted Exchange to be different, and he wanted its operation to be based on "simple common sense, mixed with just plain decency."[4]

30.    The "founding purpose" of the Exchange was to provide the "[p]olicyholders with as near perfect protection, as near perfect service, as is humanly possible, and to do so *at the lowest possible cost*."[5]  H.O. Hirt was President and Chief Executive Officer of Indemnity until 1976 and remained on the Board until 1980.  Through the years, he never forgot the guiding principles, and when he created the H.O. Trusts, prior to his passing in 1982, as a means of transferring his controlling interest in Indemnity to his children—F. William Hirt ("F.W. Hirt") and Susan Hirt Hagen—he specifically reminded them that Exchange "was organized and exists primarily *for the benefit of its subscribers* or policyholders and that therefore the interests of the

---

[4] *Above All Together: Erie Insurance Group Historic Timeline 1925-2015* at 8, Erie Insurance, https://www.erieinsurance.com/-/media/files/timeline.pdf.

[5] *Our History,* Erie Insurance, https://www.erieinsurance.com/our-history (last visited Dec. 26, 2017).

people who put their trust in the Exchange for the protection of their personal business affairs must come first."[6]

31.    Indemnity was structured with two classes of common stock—Class A and Class B.  Upon the death of H.O. Hirt in 1982, 50% of all Class A shares and 76.22% of the Class B shares, which are the only voting shares, were passed to F.W. Hirt and Susan Hirt Hagen by way of two trusts, each holding equal halves of the shares for their respective benefit.  At that time, Indemnity stock was not publicly traded.

32.    In May 1994, for the first time, shares of Indemnity Class A stock were made available for sale to the public through the filing of a Form 10 with the SEC.  The following year, it became listed on NASDAQ.[7]  Since then, as described below, the financial interests of Indemnity's stockholders, particularly those of Indemnity's controlling stockholders, have dominated those of Exchange and the Subscribers—to the point where Indemnity and the Directors are wholly disregarding their fiduciary duties to Exchange and the Class.

### The Hirt Descendants Control the Board and Pay Themselves Huge Amounts in Dividends

33.    At all relevant times, Board members have served at the pleasure of the Class B stockholders.   Since 2006, J. Hagen has been a member of the Board's Nominating Committee - the Board committee responsible for determining and nominating the candidates for the office of

---

[6]  *See In re Trust of Hirt*, 832 A.2d at 441 (citing to Subparagraph 4.03(B) of the Hirt Trust Agreement) (emphasis added).

[7]  *See Above All Together: Erie Insurance Group Historic Timeline 1925-2015* at 14, Erie Insurance, https://www.erieinsurance.com/-/media/files/timeline.pdf.  As reported in Indemnity's current Proxy Statement filed with the SEC on March 24, 2017, Indemnity has two classes of common stock.  Class A stock is non-voting and publicly traded on the NASDAQ and has approximately 46,189,068 million shares outstanding.  Class B stock has exclusive voting rights and there are approximately 2,542 shares outstanding.

director to be elected by the holders of Class B common stock, and has served as the Chair of the Nominating Committee since 2008.

34.     Since 2010, defendant Vorsheck has also been a member of the Nominating Committee as well as Susan Hirt Hagen until her death in 2015.  Further, T. Hagen is an *ex officio* member of the Nominating Committee.  Thus, with the Nominating Committee comprised of a majority of insiders and/or directors hand-picked by them, there is no "independent" body to select board nominees.  Indeed, the Board has long been comprised of multiple Hirt family members.[8]  The other members of the Board were nominated (and appointed) by the H.O. Trusts' beneficiaries and many of them have had long-standing personal relationships with the beneficiaries.[9]

35.     The Class B shares passed down from H.O. Hirt are now held in three trusts, the H.O. Trusts.   Presently, the three trustees are defendant J. Hagen, defendant Vorsheck and

---

[8] For example, F.W. Hirt, who was H.O Hirt's son, was an executive of several Indemnity subsidiaries and served as a member of the Board from 1965 until his death in 2007, with the exception of a three-year period between 1990 and 1993, having served as Chairman of the Board since at least 1995.  H.O. Hirt's daughter, Susan Hirt Hagen, was a member of the Board from 1980 until her death in 2015.  Defendant J. Hagen, the son of Susan Hirt Hagen and defendant T. Hagen, has served on the Board since 2005 and as Vice-Chairman of the Board since 2013.  T. Hagen, the husband of the late Susan Hirt Hagen and father of defendant J. Hagen, has been a director since 2007, having previously served as a director from 1979 through 2007, and has been Chairman of the Board since 2007.  Defendant Vorsheck is F.W. Hirt's daughter.

[9] For example, as part of a legal proceeding initiated in 1998 by Susan Hirt Hagen to remove Mellon Bank, N.A. ("Mellon Bank") as a trustee of the H.O. Trusts, it was revealed that her brother, F. W. Hirt (then Chairman of the Board), had made a series of gifts of Class A common stock between 1994 and 1997, aggregating $10.3 million (market value at time of gift), to certain Indemnity personnel and/or directors.  F. W. Hirt also gave $340,097 of Class A stock to Stephen A. Milne, Indemnity's then President, Chief Executive Officer and a director, and $169,438 of Class A stock to John M. Petersen ("Petersen"), Indemnity's then-former Chief Executive Officer, consultant and a director.

Sentinel Trust Company, L.B.A. ("Sentinel")—the corporate trustee since 2006.[10]  As reported in Indemnity's Proxy Statement filed with the SEC on March 24, 2017, the H.O. Trusts collectively own 2,340 shares of Class B common stock, which represents 92.05% of the outstanding shares of Class B common stock.  In addition, T. Hagen has sole voting power over 153 shares of Class B common stock held by the Hagen Family Limited Partnership, which represents 6.02% of the outstanding shares of Class B common stock.  Thus, defendants J. Hagen, T. Hagen and Vorsheck are able to determine the outcome of any matter submitted to a vote of the holders of Class B common stock as they collectively control over 98% of Class B common stock.

36.    The descendants of H.O. Hirt, in addition to controlling the Class B shares, also own approximately 45.92% (around 22 million shares)[11] of Indemnity's Class A shares and benefit substantially from the Indemnity dividends which are distributed to them as income.  In addition, each of the Directors own Class A common stock.  Therefore, defendants T. Hagen, J. Hagen and Vorsheck, and certain other Hirt family members who have served on the Board, as well as all the Directors directly benefit from Indemnity's dividends which are set at the sole discretion of the Hirt-dominated Board.

37.    Prior to Indemnity becoming a publicly traded company, and consistent with the ideals of a reciprocal insurance exchange, Exchange paid dividends to Subscribers even though its total net premiums were just a fraction of what they are today.  For example, in 1975, when Exchange wrote $108 million in premiums, the Subscribers received $10 million in dividends.[12] In contrast, despite the fact that Exchange's direct and assumed premiums have continually

---

[10]  Sentinel was named as the corporate trustee after years of legal proceedings initiated by Susan Hirt Hagen who sought to replace Mellon Bank, the former trustee.

[11]  Schedule 14C filed March 24, 2017 at 9.

[12]  *Above all Together: Erie Insurance Group Historic Timeline 1925-2015* at 11, Erie Insurance, https://www.erieinsurance.com/-/media/files/timeline.pdf.

grown over the years, and were $6.3 billion in 2016, the Subscribers have not received any dividends in over 25 years.[13]

38.     Since 1997, the Board has consistently and significantly increased the annual dividend amount, to the direct benefit of the Board members who are beneficiaries of the H.O. Trusts, as well as the Directors and other stockholders of Indemnity, and at the expense of and to the detriment of Exchange and the Subscribers.  Indeed, since 1997, *almost $1.75 billion* has been funneled from Exchange in the form of dividends to Indemnity's Class A and Class B stockholders.  Most recently, on December 5, 2017, Indemnity announced that it was yet again increasing the quarterly cash dividend to Class A and Class B shareholders by 7.3 percent while also yet again setting the Management Fee for the coming year at the maximum rate of 25 percent.

### The Subscriber's Agreement Governs Indemnity's Relationship with Exchange and the Subscribers

39.     Policyholders of the Exchange are known as Subscribers.  Since 1925, each Subscriber, including Plaintiff, has been required to execute a non-negotiable Subscriber's Agreement drafted by Indemnity.  Every Subscriber of Exchange signs an identical Subscriber's Agreement.  The material language in the Subscriber's Agreement has remained unchanged since 1975.  *See* Exhibit A.

40.     Pursuant to the terms of the Subscriber's Agreement, Indemnity is appointed the attorney-in-fact for the Subscribers and Exchange.  *See id.*  This obligates Indemnity to act with utmost trust and honesty in all dealings concerning the Subscribers and Exchange.

---

[13]  *Erie Ins. Exch. v. Erie Indem. Co.,* No. MS14-03-003, Declaratory Opinion and Order ¶ 43 (Ins. Comm'r of Pa. Apr. 29, 2015).

41.     Among other things, the Subscriber's Agreement provides Indemnity with "the power to . . . issue, change, nonrenew or cancel policies . . . collect premiums . . . [and] manage and conduct the business and affairs of [Exchange], its affiliates and subsidiaries." *Id.*

42.     The activities performed by Indemnity as attorney-in-fact for the Exchange include insurance underwriting, policy issuance, policy exchange and cancellation, processing of invoices for premiums, the establishing and monitoring of loss reserves, oversight of reinsurance transactions, investment management, payment of insurance commissions to insurance agents, compliance with rules and regulations of supervisory authorities and monitoring of legal affairs.[14]   Indemnity is obligated to conduct these activities at its own expense.[15]   At no time since 1997 has Indemnity disclosed that it performed any services for Exchange other than those authorized by the Subscriber's Agreement.

43.     Pursuant to the Subscriber's Agreement, as compensation for all services performed as attorney-in-fact and for managing and conducting the business of Exchange and paying general administrative expenses, Indemnity is permitted to retain up to 25% of all premiums written or assumed by Exchange, i.e., the Management Fee.  *See id.*

44.     Since at least 2007, Indemnity has retained the maximum amount of Management Fees allowed by the Subscriber's Agreement—25% of all premiums written or assumed by Exchange—as compensation for services performed pursuant to the Subscriber's Agreement.  As described further below, Indemnity and the Board have breached their fiduciary obligations to Exchange and the Subscribers and have abused their position of trust by charging and keeping excessive Management Fees.

---

[14]   Annual Report on Form 10- K filed March 26, 1998.

[15]   *Id.*

**Indemnity and the Board Owe Fiduciary Duties to Exchange and the Subscribers**

45.     As attorney-in-fact, Indemnity and the Board which "oversees and guides [Indemnity's] management and its business"[16] owe fiduciary duties to Exchange and the Subscribers.  Indeed, "[t]he position of the attorney-in-fact of a reciprocal insurance exchange, who manages the business of the exchange under powers of attorney of the subscribers, who provide the means for the reciprocal insurance enterprise, is fiduciary in character to the same extent as that of the management of an incorporated mutual insurance company . . . ."[17]

46.     The fiduciary obligations of Indemnity and the Board to Exchange and the Subscribers have long been memorialized in various corporate documents of Indemnity as well as in Indemnity's filings with the SEC.

47.     For example, until at least 2006, each of the Directors executed an "Acceptance of Trust" upon being appointed to the Board which explicitly acknowledged that as attorney-in-fact for the Subscribers, he/she "shall be deemed to stand in a fiduciary relationship."  *See* a true and correct copy of an Acceptance of Trust, attached hereto as Exhibit B.

48.     Thereafter, in 2007, Indemnity adopted Corporate Governance Guidelines, which are in effect to the present, "to set forth a common set of expectations as to how the Board should perform its functions."  In the first section entitled "Role of the Board," the Corporate Governance Guidelines specifically set forth the fiduciary duties of Indemnity and its Directors to Exchange and its Subscribers as it states:

> In discharging their duties, the Directors must also be mindful of the fact
> that [Indemnity] is appointed to act as the Attorney-in-Fact to [Exchange]

---

[16]  *Erie Indemnity Company Corporate Governance Guidelines* (Feb. 22, 2007), Erie Insurance, https://www.erieinsurance.com/about-us/investor/governance.

[17]  *Indus. Indem. Co. v. Golden State Co.*, 256 P.2d 677, 686 (Cal. Ct. App. 1953) (finding doctrine of corporate opportunity was equally applicable to attorney-in-fact of reciprocal insurance exchange).

> . . . by the policyholders of the Exchange under the terms of the Subscriber's Agreement between each policyholder and [Indemnity] that provides generally for the relationship between policyholders and [Indemnity] . . . Directors should treat this responsibility of [Indemnity] as one that is fiduciary in nature and consistent with each Director's Acceptance of Trust, which recognizes the Director's 'fiduciary relationship to [Indemnity] in its own right and as Attorney-in-Fact for the Subscribers of [Exchange].'

*See Erie Indemnity Company Corporate Governance Guidelines* at 2.

49.    The Corporate Governance Guidelines further state that, in discharging their duties to Exchange and the Subscribers, the Directors must do so with the express understanding that "the Company's relationship with the Exchange and its policyholders is the Company's most valuable asset."

50.    Indemnity's filings with the SEC also confirm the fiduciary duties owed to Exchange and the Subscribers by Indemnity and its Board.  For example, Indemnity has stated that "[t]he Company's Board of Directors [] acts in a fiduciary capacity with respect to the operation of the Exchange,"[18] and that "the Board has a fiduciary duty to protect the interests of the policyholders of Exchange."[19]  Further, Indemnity admits that its "primary purpose is to manage the affairs at the Exchange for the benefit of the policyholders,"[20] its "results of operations are tied to the growth and financial condition of the Exchange, and that "Exchange is [its] sole customer and [its] earnings are largely generated from management fees based on the direct and assumed premiums written by the Exchange."[21]  Indeed, as disclosed in Indemnity's 10-Q filed with the SEC on October 29, 2015, "Indemnity has the power to direct the activities of the Exchange that most significantly impact the Exchange's economic performance by acting

---

[18]  Annual Reports on Form 10-K filed March 12, 2002 and Form 10-K/A filed January 27, 2003.

[19]  Annual Reports on Form 10-K filed March 8, 2004 and February 24, 2005.

[20]  Annual Report on Form 10-K filed February 25, 2016.

[21]  Annual Report on Form 10-K filed February 25, 2016.

as the common attorney-in-fact and decision maker for the subscribers (policyholders) at the Exchange."

51.     The Board's dual fiduciary duties to Exchange and the Subscribers, on one hand, and Indemnity's stockholders, on the other, creates conflicts of interest, including when the Board: (1) sets the Management Fee paid by the Exchange to Indemnity and (2) approves the annual dividend to Indemnity's stockholders.[22]   As reflected by the actions of the Board, this conflict has resulted in the Board continually favoring the interests of Indemnity's stockholders, especially its majority stockholders, over those of Exchange and the Subscribers.

52.     Indeed, Indemnity has admitted in its filings with the SEC that the Hirt family members have favored maintaining the Management Fee rate at its 25% maximum in order to benefit themselves.   As disclosed in a report filed by Indemnity in 1999, then Chief Executive Officer Petersen wanted to reduce the Management Fee rate due to Indemnity's strong earnings. According to the report, the Hagens dissented as they favored "keeping the rate at or near the maximum 25 percent allowed . . . ."[23]

53.     As set forth below, Indemnity and the Board have breached their fiduciary duties to Exchange and the Class by unlawfully diverting to Indemnity hundreds of millions of dollars of revenue that belongs to Exchange and the Class and have breached the Subscriber's Agreement by taking the maximum 25% Management Fee year after year without valid grounds. To be sure, the conflicted and self-interested members of the Board have charged and taken grossly excessive Management Fees from the Exchange and the Subscribers and funneled the money to themselves and other Indemnity stockholders through substantial dividend payments.

---

[22]  Annual Report on Form 10-K filed February 24, 2005.

[23]  Annual Report on Form 10-K filed March 30, 1999.

**Indemnity and the Board Charge and Take Excessive Management Fees from
Plaintiff, Exchange and the Class**

54.    Since 2007, Indemnity has charged and taken the maximum 25% in Management

Fees allowed by the Subscriber's Agreement.  As shown below, the amount of Management Fees

taken by Indemnity from Plaintiff, Exchange and the Class from 2007 through the third quarter

of 2017 totals almost $14 billion:

| Year | Management Fee Rate | Management Fee Revenue[24] |
|---|---|---|
| 2007 | 25% | $947,023,000 |
| 2008 | 25% | $949,775,000 |
| 2009 | 25% | $965,110,000 |
| 2010 | 25% | $1,009,000,000 |
| 2011 | 25% | $1,067,000,000 |
| 2012 | 25% | $1,157,000,000 |
| 2013 | 25% | $1,266,401,000 |
| 2014 | 25% | $1,376,190,000 |
| 2015 | 25% | $1,475,511,000 |
| 2016 | 25% | $1,567,431,000 |
| 1st, 2nd and 3rd Quarters of 2017 | 25% | $1,268,591,000 |
| **TOTAL** | | $13,049,032,000 |

55.    Management Fee revenue is directly correlated with Indemnity's financial

success.  In its filings with the SEC Indemnity admits that it is "dependent upon management

fees paid by the Exchange,"[25] and that its "earnings are primarily driven by the management fee

revenue . . . ."[26]  Indeed, as acknowledged by Indemnity, "[m]anagement fees accounted for

---

[24]    Figures derived from Indemnity's Annual Reports on Form 10-K (for 2007-2016) and
Quarterly Reports on Form 10-Q (for 2017).

[25]    Annual Report on Form 10-K filed February 25, 2016.

[26]    Annual Report on Form 10-K filed February 23, 2017.

95.9%, 95.9%, and 96.5%, respectively, of [its] revenues for the three years ended December 31, 2014, 2015 and 2016."[27]

56.     The Board sets the rate of the Management Fee in December for the following year.  For 2015-2018, the Board set the Management Fee rate at 25% at Board meetings held on December 2, 2014 (for 2015),[28] December 1, 2015 (for 2016),[29] December 6, 2016 (for 2017) [30] and December 5, 2017 (for 2018)[31].  Defendants Borneman, Cavanaugh, J. Hagen, T. Hagen, Hartz, Lilly, Palmer, Sheffield, Stover, Vorsheck and Wilburn were the members of the Board who made the decision to set the Management Fee rate at 25% at the Board meetings on December 2, 2014 and December 1, 2015.  Defendants Borneman, Datesh, J. Hagen, T. Hagen, Hartz, Lilly, Lucore, Palmer, Sheffield, Stover, Vorsheck and Wilburn were the members of the Board who made the decision to set the Management Fee rate at 25% at the Board meeting held on December 6, 2016.  Defendants Borneman, Connell, Datesh, J. Hagen, T. Hagen, Hartz, Hudson, Lilly, Lucore, Palmer, Sheffield, Stover and Vorsheck were the members of the Board who made the decision to set the Management Fee rate at 25% at the Board meeting held on December 5, 2017.

57.     These Defendants have charged and taken grossly excessive Management Fees from Exchange and the Class for years.  For example, defendants Borneman, J. Hagen, T. Hagen, Hartz, Lilly, Palmer and Vorsheck, have served on the Board since 2007 and made the decision to set the Management Fee rate at 25% for each of these years.  Defendant Cavanaugh,

---

[27]  Schedule 14C filed March 24, 2017.

[28]  Current Report on Form 8-K filed December 3, 2014.

[29]  Current Report on Form 8-K filed December 2, 2015.

[30]  Current Report on Form 8-K filed December 7, 2016.

[31]  Current Report on Form 8-K filed December 5, 2017.

defendants Sheffield and Stover and defendant Wilburn served on the Board from 2008-2016, 2010-2017, and 2007-2017, respectively, and also participated in the Board's decision to set the Management Fee rate at 25% for each of the years on which they served on the Board.[32]

58.    Indeed, a majority of the current thirteen-member Board (i.e., defendants Borneman, J. Hagen, T. Hagen, Hartz, Lilly, Palmer and Vorsheck) made the decision to take and charge excessive Management Fees by taking the maximum 25% *every year* since 2007.

59.    The Board was obligated to act with the utmost loyalty, honesty and integrity and at all times in the best interests of Exchange and the Subscribers in setting the Management Fee rate.  Rather than complying with their fiduciary obligations to Exchange and the Subscribers, however, Indemnity and the Board have subordinated the interests of Exchange and the Subscribers to those of Indemnity and its stockholders by charging grossly excessive Management Fees.

60.    As set forth below, several metrics and statistical analysis demonstrate that the Management Fees charged and taken by Indemnity over the years has been grossly excessive.

61.    For example, based upon a review of industry-wide profitability reports issued by the National Association of Insurance Commissioners ("NAIC")[33] and Indemnity's financial

---

[32]   For 2007-2014, the Board set the Management Fee rate at 25% at Board meetings held on December 12, 2006 (for 2007), December 12, 2007 (for 2008), December 9, 2008 (for 2009), December 8, 2009 (for 2010), December 7, 2010 (for 2011), December 6, 2011 (for 2012), December 4, 2012 (for 2013), and December 3, 2013 (for 2014).  *See* Current Report on Form 8-K filed December 13, 2006; Current Report on Form 8-K filed December 12, 2007; Current Report on Form 8-K filed December 11, 2008; Current Report on Form 8-K filed December 10, 2009; Current Report on Form 8-K filed December 7, 2010; Current Report on Form 8-K filed December 8, 2011; Current Report on Form 8-K filed December 5, 2012; Current Report on Form 8-K filed December 4, 2013.

[33]   According to its website, the NAIC "is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories. Through the NAIC, state insurance regulators establish standards and best practices, conduct peer review, and coordinate their regulatory

statements filed with the SEC and the Pennsylvania Department of Insurance, the excessive Management Fees charged by Indemnity and the Board have allowed Indemnity to achieve huge profitability levels that are many multiples higher than those of its peers in the U.S. property and casualty insurance industry as well as that of Exchange.

62.     In January 2017, the NAIC issued its Report on Profitability By Line By State in 2015 (the "2015 Profitability Report") "to estimate and allocate profitability in property/casualty (P/C) insurance by state and line of insurance."  The 2015 Profitability Report is compiled based upon annual financial statements and exhibits filed with the NAIC by 2,924 property and casualty insurers and the NAIC estimates that well in excess of 95% of the premiums written in the U.S. are represented in the report.

63.     According to the 2015 Profitability Report, for 2006 through 2015, the average return on net worth (or return on equity) for property and casualty insurers in the U.S., like Indemnity, was 6.6%.  The average return on net worth for property and casualty insurers in the U.S. for these years ranged from a low of 2.2% (in 2008) to a high of 12.2% (in 2006).  In stark contrast, Indemnity, achieved an average return on net worth for 2006 through 2015 that was nearly ***three times as high* as** that for both the average return on net worth achieved by Indemnity's peers in the property and casualty industry as well as achieved by Exchange for whom Indemnity and the Board serve as fiduciaries as demonstrated in the chart below:[34]

---

oversight. NAIC staff supports these efforts and represents the collective views of state regulators domestically and internationally. NAIC members, together with the central resources of the NAIC, form the national system of state-based insurance regulation in the U.S."  Nat'l Ass'n of Ins. Comm'rs, *About the NAIC*, http://www.naic.org/index_about.htm (last visited Dec. 26, 2017).

[34]  While the accounting systems from the three sets of reports from which these values were obtained differ somewhat, such differences do not materially affect the results.  Specifically, the NAIC profit values were calculated by the NAIC using an approximate Generally Accepted Accounting Principles ("GAAP") method, wherein the NAIC made a conversion from Statutory

| Year | Average Return on Net Worth for U.S. Property and Casualty Industry[35] | Return on Net Worth for Indemnity[36] | Return on Net Worth for Exchange[37] |
|---|---|---|---|
| 2006 | 12.2% | 16.7% | 14.9% |
| 2007 | 9.7% | 19.2% | 15.2% |
| 2008 | 2.2% | 7.5% | (7.6%) |
| 2009 | 5.7% | 12.8% | (1.4%) |
| 2010 | 6.0% | 17.9% | 11.8% |
| 2011 | 3.4% | 20.0% | 3.6% |
| 2012 | 5.2% | 22.5% | 6.0% |
| 2013 | 8.0% | 23.6% | 8.5% |
| 2014 | 6.6% | 23.3% | 5.5% |
| 2015 | 6.6% | 23.7% | 6.8% |
| Average for 2006 through 2015 | 6.6% | 18.2% | 6.4% |

64.    While the NAIC has not released its profitability report for 2016, Indemnity

experienced a staggering 26.5% return on net worth in 2016—its highest rate of return since

---

Accounting Principles ("SAP") to GAAP; Indemnity used GAAP in preparing its Annual Reports; and Exchange used SAP in preparing its Statutory Annual Statements. As explained in the 2015 Profitability Report, during 2015, the profit percentage for the property and casualty insurance industry on a SAP basis was 7.2% compared to the approximate GAAP value of 6.6%. That is a difference of less than 1%. *Report on Profitability By Line By State in 2015*, Nat'l Ass'n of Ins. Comm'rs (Jan. 2017) at 35, 37, www.naic.org/prod_serv/PBL-PB-16.pdf. The average annual difference between SAP and the NAIC approximate GAAP values from 2006 to 2015 was 0.8%, with the SAP values being higher. Thus, the slight difference in accounting systems does not explain the huge excess of Indemnity's profits over that for Exchange or the property and casualty insurance industry as a whole.

[35]  *See* 2015 Profitability Report at 148.

[36]  Return on Net Worth for Indemnity was calculated using the data contained in Indemnity's Annual Reports filed with the SEC for each of the years listed above as follows: Net Income / Average Equity During the Year.

[37]  Return on Net Worth for Exchange was calculated using data contained in Exchange's Statutory Annual Statements for each of the years listed above as follows: Net Income/Beginning Policyholder Surplus. For purposes of this calculation, Beginning of Year Policyholder Surplus was used instead of the Average Surplus During the Year. This tends to yield a slightly higher profit ratio as surplus generally increases during the year and hence dividing by the slightly lower Beginning Policyholder Surplus gives a slightly higher ratio. If the Average Surplus During the Year was used in the calculation instead, the Return on Net Worth for Exchange would be slightly lower, and the disparity with the very high profits for Indemnity would be even larger.

before 2006—which is more than four times as high as the average return for the U.S. property and casualty industry in 2015 and more than 3.5 times as high as the return for Exchange in 2016 of 7.1%.   Since revenue derived from Management Fees comprises almost the entirety of Indemnity's revenue, Indemnity's astronomical returns are almost wholly attributable to the grossly excessive Management Fees which Indemnity and the Board has charged to Plaintiff, Exchange and the Class.   The vast disparity between the rates of return attained by Indemnity and Exchange plainly demonstrates that the Board has subordinated the interests of Exchange and its Subscribers to those of Indemnity and its stockholders.

65.     Several other measures demonstrate that Indemnity's profits are significantly higher than its peers and the entire property and casualty industry, such as the target profit values used by insurance regulators and insurance organizations.   For example, the California Department of Insurance develops a "Maximum Permitted Rate of Return" that it allows for insurance companies.[38]   During 2017, the Maximum Permitted Rate of Return allowed for insurance companies by the California Department of Insurance ranged from 7.65% to 7.79%.[39]   During 2016 this Maximum Permitted Rate of Return ranged from 7.09% to 7.48%.   This is generally consistent with the profits of the property and casualty insurance industry and Exchange, but again demonstrates Indemnity's egregiously excessive profits it has been able to

---

[38]  The Maximum Permitted Rate of Return is the highest target return on equity (or net worth) allowed for insurance companies which is meant to obtain a "return that fully compensates the insurer for its risk".   Net worth and equity generally refer to the same financial measure, but both can vary slightly based upon the accounting system used.   The Maximum Permitted Rate of Return is calculated using the formula set forth in the California Insurance Regulation 10 CCR § 2644.16.

[39]  Maximum Permitted Rate of Return & Yields for Investment Income Calculation - September 2017 (Date Posted: Oct 3, 2017), Cal. Dep't of Ins., https://www.insurance.ca.gov/0250-insurers/0800-rate-filings/0200-prior-approval-factors/.

achieve by charging and taking grossly excessive Management Fees from Exchange and the Subscribers.

66.     With regard to insurance organizations, the Pennsylvania Compensation Rating Bureau ("PCRB") / Delaware Compensation Rating Bureau ("DCRB")[40,41] recently made a filing for workers compensation insurance rates in Delaware with a target "Internal Rate of Return (Cost of Capital)" of 8.71%.[42,43]   Again, this is generally consistent with the profits of the property and casualty insurance industry and Exchange, but further exemplifies the hugely inflated profits that Indemnity has been able to achieve by charging grossly excessive Management Fees.  In insurance regulatory rate proceedings, for the purpose of determining a fair rate of return, the value derived across a broad spectrum of property casualty insurance is commonly used as being applicable to workers compensation.[44]

67.     When evaluating a company's profits and whether they are reasonable, consideration should also be given to the risk of the business as it is well accepted that high risk

---

[40]   The same organization operates in both Pennsylvania and Delaware (http://pcrb.com (last visited Dec. 27, 2017)).

[41]   The PCRB describes itself as "a non-profit corporation formed in 1915 in accordance with the insurance laws of Pennsylvania and is not affiliated with state government. The PCRB's enabling statute specified that classification of employers, underwriting rules, policy forms, loss cost values and rating plans for workers compensation shall be proposed by a rating bureau situated within the state.  The PCRB is subject to supervision and examination by the Pennsylvania Insurance Commissioner, who must approve its ability to compile loss costs on an equitable and impartial basis.  The PCRB membership is comprised of all insurance carriers, including the State Workers' Insurance Fund ("SWIF"), authorized to sell workers compensation insurance in Pennsylvania."   PCRB, Organization, http://pcrb.com/shared/p_contents.htm (last visited Dec. 27, 2017).

[42]   *See* DCRB Filing No. 1701 Residual Market Rate and Voluntary Market Loss Cost Filing Proposed Effective December 1, 2017, Ex. 9 at 2, http://www.pcrb.com/shared/d_contents.htm.

[43]   Internal Rate of Return (Cost of Capital) is a target return on equity (or net worth) value used by insurance companies.

[44]   In fact, this is the procedure that was used by the DCRB in its analysis of a reasonable rate of return.

businesses should have the opportunity for higher than average profits. Therefore, if Indemnity had a higher than average risk, that might be a partial explanation for higher than average profits.[45] However, the exact opposite is true. Indemnity is not a higher than average risk enterprise; rather, it is a lower than average risk business, and hence reasonable profits should be lower than average. Indeed, Indemnity's risk is lower than average when evaluated from either a qualitative or quantitative perspective.

68.     On a qualitative basis, insurance business costs can be broken down into two main components: (i) the payment of claims and (ii) expenses of running the insurance business. It is widely acknowledged by insurance experts and those in the industry that the risk involved in the payment of claims is much higher than funding the expenses of running the insurance business. Indeed, the payment of claims is clearly much riskier because there is a significant degree of uncertainty regarding the number of claims that will occur (claim frequency) and the dollar cost of those claims (claim severity). Those issues are of much less concern for expenses than for claims.[46] In the case of Exchange and Indemnity, the former is responsible for funding the payment of claims and the latter is responsible for the payment of expenses. Hence, Exchange keeps the more risky part of the insurance business and bears the vast majority of the risk whereas Indemnity is responsible for the less risky part, yet Indemnity is reaping very high profits.[47]

---

[45]  However, given Indemnity's very high return on net worth, the company would need to be much more risky than average, which would be quite unusual, and, as discussed herein, is not the case.

[46]  Indemnity can reasonably plan for the number of employees it needs, and the compensation of those employees, without there being a significant risk that there will be a material variation from planned to actual.

[47]  The fact that the expense costs are less risky than the loss costs can be confirmed statistically. The coefficient of variation of underwriting expenses for the property casualty insurance industry from 2007 to 2016 was 0.015 compared to the coefficient of variation for losses (plus loss

69.     On a quantitative basis, risk can be measured based on the variability of the results.  Two of the most common measures of variability are the coefficient of variation[48] and the Beta[49] of the company.  For both of these measures, a higher value indicates a higher risk.

70.     The coefficient of variation for the property and casualty insurance industry, Indemnity and Exchange during the time period of 2006-2015 (using the data forth in table at Paragraph 63) is 0.44, 0.28 and 1.12, respectively.  The coefficient of variation for Indemnity is only 64% of the value for the combined property and casualty insurance industry and only 25% of the value for Exchange.  Hence, Indemnity is less risky than either the property and casualty insurance industry or Exchange on this accepted measure of risk.[50]

---

adjustment expenses) of 0.052.  As discussed herein, the coefficient of variation is a measure of risk, with a higher value indicating more risk.  Hence, using this accepted measure, the risk associated with expense costs is less than one third the risk associated with loss costs.  This is further evidence that Indemnity has low risk.

[48]  A coefficient of variation (CV) is a statistical measure of the dispersion of data points in a data series around the mean. It is calculated as follows: standard deviation / expected value. The coefficient of variation represents the ratio of the standard deviation to the mean, and it is a useful statistic for comparing the degree of variation from one data series to another, even if the means are drastically different from one another.  *See* Investopedia, *Coefficient of Variation – CV*, http://www.investopedia.com/terms/c/coefficientofvariation.asp (last visited Dec. 27, 2017).

[49]  Beta is a measure of the volatility, or systematic risk, of a security or a portfolio in comparison to the market as a whole. Beta is used in the capital asset pricing model (CAPM), which calculates the expected return of an asset based on its beta and expected market returns. Beta is also known as the beta coefficient. *See* Investopedia, *Beta*, http://www.investopedia.com/terms/b/beta.asp (last visited Dec. 27, 2017).

[50]  When comparing Indemnity to the property and casualty insurance industry on this measure, it would be more accurate to compare Indemnity to other specific companies instead of all companies combined because the combination of all property and casualty insurance companies together tends to lower the coefficient of variation because the risk for one company tends to partially offset the risk of other companies when combined.  Therefore, the combined coefficient of variation of the property and casualty insurance industry is somewhat lower compared to that for a specific company.  If an adjustment were made for this, it would increase the coefficient of variation for the property and casualty insurance industry and make the disparity with Indemnity even larger, providing even stronger evidence that Indemnity is less risky.

71.     With regard to the Beta measure of risk, the average business in the economy has a value of 1.00.  A Beta value less than 1.00 is below average risk and higher than 1.00 is above average risk.  A recent value for the Beta of Indemnity is 0.48.[51]  Hence, Indemnity has less than half the risk of the average business based on this accepted measure of risk.  A Beta value is not available for the entire property and casualty insurance industry since Beta values are commonly calculated only for publicly traded companies.  However, it is possible to develop estimates of Beta for the property and casualty insurance industry.  For example, the PCRB/DCRB included such a calculation in its most recent filing for workers compensation insurance in Delaware, and derived a value of 0.87.[52]  Hence, on this accepted measure of risk, Indemnity is only about half the risk of the property and casualty insurance industry.

72.     Further, Indemnity's Beta of 0.48 can be compared to certain of its peers identified by Indemnity in its filings with the SEC.  Specifically, in its Proxy Statement filed with the SEC on March 24, 2017, Indemnity lists the following publicly-traded companies as its peers: 1) Allstate Insurance Group; 2) Cincinnati Insurance Companies; 3) State Auto Insurance Companies; and 4) Travelers Group.[53]  The Beta for each of these companies is 1.11, 0.95, 0.86 and 1.27, respectively.[54]  Thus, Indemnity has only about half the risk of its own hand-picked

---

[51]     Reuters, *Erie Indemnity Co. (ERIE.OQ)*, https://www.reuters.com/finance/stocks/ overview/ERIE.OQ (last visited Dec. 27, 2017).

[52]     DCRB Filing No. 1701 Residual Market Rate and Voluntary Market Loss Cost Filing Proposed Effective December 1, 2017, Ex. 9 at 21, http://www.pcrb.com/shared/d_contents.htm.

[53]     Each peer company is a wholly-owned subsidiary of a publically-traded holding company as follows: 1) Allstate Corp.; 2) Cincinnati Financial Corp.; 3) State Auto Financial Corp.; and 4) Travelers Companies, Inc.  The Beta values listed above are those values as reported by each of the publically-traded holding companies.

[54]     Reuters, *Allstate Corp. (ALL.N)*, https://www.reuters.com/finance/stocks/overview/ALL.N (last visited Dec. 27, 2017); Reuters, *Cincinnati Financial Corp (CINF.OQ)*, https://www.reuters.com/finance/stocks/overview/CINF.OQ (last visited Dec. 27, 2017); Reuters, *State Auto Financial Corp. (STFC.OQ)*, https://www.reuters.com/finance/

peers, which is consistent with its significantly lower risk as compared to the entire property and casualty insurance industry discussed above.

73.    In sum, Indemnity has had incredibly high profits; about three times as much as the entire property and casualty insurance industry or Exchange during the 10-year period from 2006 to 2015.  That discrepancy cannot be explained because of the risk of the business for Indemnity.  Rather, since Indemnity is significantly lower in risk, reasonable profits would be lower than, not higher than, that for property and casualty insurance companies or Exchange. Indeed, the foregoing analysis confirms that Indemnity has been charging and taking grossly excessive Management Fees.

**Indemnity's Directors and Stockholders, Including the Hirt Family Descendants, Have Profited Immensely from Dividends Derived from the Grossly Excessive Management Fees Taken by Indemnity from Exchange and the Subscribers**

74.    As demonstrated in the chart above at Paragraph 54, since 2007, Indemnity has taken almost $14 billion in Management Fees.  These enormous sums paid to Indemnity for Management Fees have allowed Indemnity's stockholders, especially the insiders on the Board who are beneficiaries of the H.O. Trusts, to benefit considerably through the dividends paid by Indemnity to its Class A and Class B stockholders.  Throughout the relevant period, the insider beneficiaries of Indemnity have owned close to a majority of the outstanding Class A stock or about 22 million shares.

75.    The chart below reflects the total amount of dividends paid by Indemnity from 1997-2017 and the per share basis to the Class A and Class B stockholders:

| Year | Total $ (in millions) | Class A | Class B |
|------|----------------------|---------|---------|
| 1997 | $26.5 | $.3925 | $58.875 |

stocks/overview/STFC.OQ (last visited Dec. 27, 2017); Reuters, *Travelers Companies Inc. (TRV.N)*, https://www.reuters.com/finance/stocks/overview/TRV.N (last visited Dec. 27, 2017).

| | | | |
|---|---|---|---|
| 1998 | $29.9 | $.4425 | $66.375 |
| 1999 | $32.8 | $.4950 | $74.250 |
| 2000 | $36.2 | $.5575 | $83.625 |
| 2001 | $40.4 | $.6275 | $94.125 |
| 2002 | $45.0 | $.7000 | $105.000 |
| 2003 | $50.6 | $.7850 | $117.750 |
| 2004 | $55.1 | $.9700 | $145.500 |
| 2005 | $81.9 | $1.335 | $200.250 |
| 2006 | $86.1 | $1.480 | $222.000 |
| 2007 | $91.1 | $1.640 | $246.000 |
| 2008 | $92.3 | $1.770 | $265.500 |
| 2009 | $93.0 | $1.830 | $274.500 |
| 2010 | $98.0 | $1.955 | $293.250 |
| 2011 | $102.0 | $2.0975 | $314.625 |
| 2012* | $95.0 | $2.000 | $300.000 |
| 2012 | $229.0 | $4.250 | $637.500 |
| 2013 | $83.6 | $2.4125 | $361.875 |
| 2014 | $118.5 | $2.586 | $387.900 |
| 2015 | $126.9 | $2.773 | $415.950 |
| 2016 | $136.0 | $2.9725 | $445.875 |
| First and Second Quarters of 2017 | $72.9 | $1.5650 | $234.750 |
| **TOTAL** | $1,822.8 | | |

*In 2012, in addition to its regular dividend payment, Indemnity made an additional "special" dividend payment to its stockholders.

76.     Since 1997, through the premiums generated by Exchange, Indemnity has paid over $1.82 billion in dividends to its stockholders, with the beneficiaries of the H.O. Trusts reaping **over $725 million** from their ownership of the Class A stock alone.  In 2012, in addition to the regularly quarterly dividend declared in November, the Board also declared a special one-time cash dividend of $2.00 on each Class A share and $300.00 on each Class B share, totaling $95 million.  The Board declared the special dividend "due to the potential significant increases in tax rates on 2013 dividend income" which would have affected those in higher tax brackets such as the Hirt beneficiaries.

77.     Indemnity admits in its public filings with the SEC that the Board has conflicting fiduciary duties to the Exchange and Subscribers, on the one hand, and Indemnity's stockholders, on the other hand, when it makes certain decisions, including, specifically, setting the annual Management Fee rate and setting the annual dividend amount.   Further, the Board makes these admittedly conflicting decisions at the same Board meeting and does so without the use or input of any advisory committee comprised of Subscribers to ensure that the Board is making decisions in the best interests of Exchange and the Subscribers.[55]   Indeed, in each December since 1995, the Board has taken simultaneous action to prospectively (1) set the Management Fee rate charged by Indemnity to Exchange and the Subscribers, and (2) approve an increase in shareholder dividends to Indemnity's stockholders.  Based upon the foregoing, it is clear that the Board has continuously put the interests of Indemnity and its stockholders over that of Exchange and the Subscribers.

## CLASS ACTION STATEMENT

78.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), (b)(2), and/or (b)(3) on behalf of the following proposed Class:

> All current and former Subscribers of Erie Insurance Exchange during the applicable statute of limitations.

79.     The Class excludes Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.

80.     The Class is so numerous that joinder of all members is impracticable.

81.     The Class can be readily ascertained through the records maintained by Indemnity and Exchange.

---

[55]   *See* Michael A. Haskel, Esq., The Legal Relationship Among A Reciprocal Insurer's Subscribers, Advisory Committee and Attorney-in-Fact, 6 N.Y. City L. Rev. 35, 41-42 (2003).

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

83.     Plaintiff's claims are typical of the claims of the Class.  As alleged herein, Plaintiff and members of the Class sustained damages arising out of Defendants' common course of unlawful conduct.

84.     There are questions of law and fact common to the Class, the answers to which will advance the resolution of the claims of all class members, including but not limited to:

   a.     Whether the Management Fees charged by Indemnity to the Subscribers and Exchange were excessive and violative of the implied covenant of good faith and fair dealing that runs with the Subscriber's Agreement;

   b.     Whether Indemnity and the Board breached their fiduciary duties to Exchange and the Subscribers in setting and taking grossly excessive Management Fees;

85.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual class members.

86.     The same common issues predominate with respect to all members of the Class, regardless of when they were Subscribers.

87.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has no claims antagonistic to those of the Class.  Plaintiff has retained counsel competent and experienced in complex nationwide class actions, including all aspects of litigation.   Plaintiff's counsel will fairly, adequately and vigorously protect the interests of the Class.

88.     Class action status is warranted under Rule 23(b)(1)(A) because the prosecution of separate actions by or against individual members of the Class would create a risk of

inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants.

89.     Class action status is also warranted under Rule 23(b)(1)(B) because the prosecution of separate actions by or against individual members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

90.     Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

91.     Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## DERIVATIVE ALLEGATIONS

92.     Plaintiff brings claims derivatively in the right and for the benefit of Exchange to redress the Defendants' breaches of fiduciary duties and other violations of law.

93.     Plaintiff is a Subscriber of the Exchange and was a Subscriber of the Exchange at all times relevant hereto.

94.     Plaintiff will adequately and fairly represent the interests of Exchange and the Subscribers in enforcing and prosecuting its rights.

95.     Pa. R.C.P. 1506 permits "members of a corporation or similar entity" to file a derivative action when "the corporation or entity refuses or fails to enforce rights which could be asserted by it."

96.     Exchange does not have its own board of directors, thus, there is no board upon which to make a demand.  Rather, the Directors, as attorneys-in-fact for Exchange, are charged with acting as fiduciaries on behalf of Exchange.

97.     As discussed herein, pursuant to the Corporate Governance Guidelines, "the Directors should treat this responsibility of the Company as one that is fiduciary in nature and consistent with each Director's Acceptance of Trust . . . to satisfy the obligations of the Company to the Exchange, the Directors should cause the Company to act in a manner they reasonably believe is in the best interests of the Exchange and its policyholders."  There has been a standing subcommittee of the Board which was formed in 2008 entitled the "Exchange Relationship Committee," however, in its public filings, Indemnity has never disclosed the responsibilities of this committee and has never reported that the members of the committee have ever met in the nine years of its existence.

98.     By reason of their positions as attorneys-in-fact for Exchange and because of their ability to control and conduct the business and corporate affairs of Exchange, the Directors owe Exchange the fiduciary obligations of good faith, trust and loyalty and were and are required to use their utmost ability to control and manage the Exchange in a fair, just, honest, and equitable manner.

99.     The Directors were and are required to act in furtherance of the best interests of Exchange so as to benefit Exchange and the Subscribers and not in furtherance of their personal interest or benefit and were required to refrain from unduly benefiting themselves and Indemnity

insiders at the expense of Exchange.  Each Director owes to Exchange the fiduciary duty to exercise good faith and diligence in the administration of the business and affairs of Exchange and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

100.    The Directors, because of their positions of control and authority as attorneys-in-fact for Exchange, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

101.    The Directors have acted in their own best interests and/or in the best interests of Indemnity and its insiders by taking excessive Management Fees from Exchange.  The Directors' unlawful misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as fiduciaries to Exchange.

102.    The Directors' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.  Rather, their actions were patently unlawful, and as a direct and proximate result of the Directors' foregoing breaches of fiduciary duties, Exchange has sustained significant damages, including, but not limited to, the misappropriation of billions of dollars in excessive Management Fees.

### CLAIMS FOR RELIEF

**Count I**
**Breach of Fiduciary Duty**
**(Plaintiff v. Indemnity and the Directors)**

103.    Plaintiff repeats and re-alleges the allegations set forth in the foregoing Paragraphs 1-102 of this Complaint as if fully set forth herein.

104.    At all relevant times, Indemnity was an agent, attorney-in-fact, and fiduciary for the Plaintiff, Exchange, and the Class.

105.    At all relevant times in which they served on the Board, the Directors also agreed to serve as agents, attorneys-in-fact, and fiduciaries for Plaintiff, Exchange and the Class.

106.    As fiduciaries, Indemnity and the Directors were obligated to act loyally, with utmost honesty and solely in the best interests of the Plaintiff and the Class.

107.    Since at least 2007, Indemnity and the Directors have sought to profit at the direct expense of Plaintiff and the Class and, among other things, have authorized, taken and retained excessive Management Fees from Exchange and the Class in order to, *inter alia*, pay ever increasing dividends to the shareholders of Indemnity and thereby improve their own financial positions.

108.    The funds use to pay the grossly excessive Management Fees taken by Indemnity and the Directors would have been used for the benefit of the Plaintiff and the Class had they not been taken by Indemnity.  Instead, Indemnity and its stockholders directly benefitted from the funds.

109.    Indemnity and the Directors breached their fiduciary duties to Plaintiff and the Class by authorizing, enabling, and/or otherwise permitting Indemnity to retain excessive Management Fees from Exchange.

110.    As a result of Indemnity and the Directors' breach of their respective fiduciary duties, Plaintiff and the Class have suffered substantial damages, including, but not limited to, monetary losses stemming from Indemnity's unlawful taking and retention of excessive Management Fees.

111.    Because Indemnity and the Directors breached their duties knowingly, willingly, and/or with reckless disregard, Plaintiff and the Class seek punitive damages.

## Count II
### Breach of Fiduciary Duty
**(Plaintiff, derivatively on behalf of Exchange v. Indemnity and Directors)**

112.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-111 of this Complaint as if fully set forth herein.

113.     The Defendants owed and owe Exchange fiduciary obligations.  By reason of their fiduciary relationships, the Defendants owed and owe Exchange the highest obligation of good faith and loyalty.

114.     The Directors, and each of them, violated and breached their fiduciary duties of loyalty and good faith by charging and taking grossly excessive Management Fees from Exchange.

115.     As a direct and proximate result of the Directors' failure to perform their fiduciary obligations, Exchange has sustained significant damages, as alleged herein.

116.     Plaintiff, on behalf of Exchange, has no adequate remedy at law.

## Count III
### Breach of Contract and Implied Covenant of Good Faith and Fair Dealing
**(Plaintiff v. Indemnity)**

117.     Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-116 of this Complaint as if fully set forth herein.

118.     Pursuant to the terms of the Subscriber's Agreement, Indemnity is permitted to take up to 25 percent of the premiums written or assumed by Exchange as the agreed to limit of compensation for serving as attorney-in-fact, managing the business and affairs of Exchange and performing other services.  However, as the attorney-in-fact, and pursuant to the implied covenants of good faith and fair dealing that run with the Subscriber's Agreement, the percentage taken by Indemnity must be appropriate and equitable.

119.    Indemnity has been taking the maximum Management Fee year after year without abiding by its duty to act in good faith and to deal fairly with Plaintiff and the Class in setting the Management Fee.  By taking grossly excessive Management Fees, Indemnity has breached the Subscriber's Agreement.

120.    This conduct constitutes a breach of the implied covenant of good faith and fair dealing. Indemnity has precluded Plaintiff and the Class from realizing the full benefits of their bargains under the terms of the Subscriber's Agreement.

121.    As a result of the breaches, Plaintiff and Class have suffered substantial damages, including, but not limited to, monetary losses stemming from Indemnity's unlawful taking and retention of grossly excessive Management Fees

122.    Indemnity's intentional and unlawful retention of this grossly excessive compensation evidences bad faith, especially in light of Indemnity's role as a fiduciary to the Plaintiff and Class.

123.    As a result of Indemnity's breach of the implied covenant of good faith and fair dealing inherent to the Subscriber's Agreement, Plaintiff and Class have suffered substantial damages, including, but not limited to, significant monetary losses resulting from Indemnity's taking of the grossly excessive Management Fees which should have been used for the benefit of Plaintiff and the Class.

**Count IV**
**Unjust Enrichment**
**(Plaintiff v. Defendants J. Hagen, T. Hagen and Vorsheck)**

124.    Plaintiff repeats and re-alleges the allegations set forth in Paragraphs 1-123 of this Complaint as if fully set forth herein.

125.    Defendants J. Hagen, T. Hagen and Vorsheck, have received excessive and unwarranted payments or the inequitable transfer of Exchange assets in the form of Indemnity dividends as a result of the misconduct complained of herein.

126.    It would be unconscionable and against the fundamental principles of justice, equity and good conscience for these defendants to retain the excessive and unwarranted payments or the inequitable transfer of Exchange's assets they have received.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff requests that this Court enter a judgment against Defendants and in favor of Plaintiff:

A.    Certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as a representative of the Class and Plaintiff's counsel as counsel for the Class;

B.    Declaring, adjudging and decreeing the conduct alleged herein as unlawful including, but not limited to, Defendants' retention of grossly excessive Management Fees;

C.    Enjoining Defendants from continuing to retain excessive Management Fees;

D.    Awarding compensatory and punitive damages along with pre- and post-judgment interest;

E.    Granting Plaintiff the costs of suit, including reasonable attorneys' fees and expenses; and

F.    Affording Plaintiff with such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  December 28, 2017

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

By:  _/s/ Joseph H. Meltzer_
Joseph H. Meltzer, Esquire
PA: 80136
Peter A. Muhic, Esquire
PA: 73501
Robin Winchester, Esquire
PA: 86590
280 King of Prussia Road
Radnor, PA  19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**RADCLIFFE & DEHAAS, L.L.P.**
William M. Radcliffe, Esquire
PA: 18148
2 West Main Street, Suite 700
Uniontown, PA 15401
Telephone: (724) 439-3900
Facsimile:  (724) 439-3335

## VERIFICATION

I, Lynda Ritz, hereby verify that I have authorized the filing of the attached Verified Class Action and Derivative Complaint, that I have reviewed the Verified Class Action and Derivative Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 12.28.17

(Lynda Ritz